**EXHIBIT A**
**Winding Up Order**

IN THE SUPREME COURT OF VICTORIA
AT MELBOURNE
COMMERCIAL COURT
CORPORATIONS LIST

Not Restricted

S CI 2016 01290

IN THE MATTER OF LEGEND INTERNATIONAL HOLDINGS INC ARBN 120 855 352

| | |
|---|---|
| INDIAN FARMERS FERTILISER COOPERATIVE LIMITED AND KISAN INTERNATIONAL TRADING FZE | Plaintiffs |
| v | |
| LEGEND INTERNATIONAL HOLDINGS INC (ARBN 120 855 352) | Defendant |

S CI 2016 1730

IN THE MATTER of Legend International Holdings Inc

| | |
|---|---|
| ~~PETER LEE~~ LEGEND INTERNATIONAL HOLDINGS INC (ARBN 120 855 352) (as debtor in possession of the assets of Legend International Holdings Inc) | Plaintiff |
| v | |
| LEGEND INTERNATIONAL HOLDINGS INC (ARBN 120 855 352) | Defendant |

---

| | |
|---|---|
| JUDGE: | Randall AsJ |
| WHERE HELD: | Melbourne |
| DATE OF HEARING: | 27 and 30 May 2016 |
| DATE OF JUDGMENT: | 2 June 2016 |
| CASE MAY BE CITED AS: | Legend International Holdings Inc (as debtor in possession of the assets of Legend International Holdings Inc) v Legend International Holdings Inc |
| MEDIUM NEUTRAL CITATION: | [2016] VSC 308 |

---

CORPORATIONS – *Cross-Border Insolvency Act 2008* (Cth) – Model Law on Cross-Border Insolvency – Application for recognition of Chapter 11 of the Bankruptcy Code US proceeding as a foreign main proceeding – Location of registered office – Centre of main interests – *Corporations Act 2001* (Cth) s 481 – International Private Law.

---

| APPEARANCES: | Counsel | Solicitors |
|---|---|---|
| For the Plaintiff | Mr J P Moore QC with Mr P S Noonan | Waterson Legal |
| For the Defendant | Mr P D Crutchfield QC with Mr O Biggs | Ashurst Australia |

HIS HONOUR:

1    Legend International Holdings Inc ('Legend') is a corporation incorporated in the State of Delaware, USA, on 1 May 2001.

2    Indian Farmers Fertilizer Cooperative Limited ('IFFCO') was incorporated in the Republic of India. Kisan International Trading FZE ('Kisan') is a subsidiary of IFFCO.

3    On 14 July 2008:

   (a)    IFFCO and Legend entered into a Share Options Agreement whereby IFFCO acquired the option to purchase shares in Legend;

   (b)    IFFCO and Joseph Gutnick ('Gutnick'), a director of Legend, entered into a shareholders agreement in order to regulate their relationship as shareholders in Legend; and

   (c)    by an Affiliate Deed of Adherence, Kisan agreed to be bound by the terms of the shareholders agreement.

4    Pursuant to the terms of those agreements, IFFCO and Kisan purchased 20 million shares in Legend for a total of US$40.4 million. IFFCO later purchased a further 14,364,000 shares in Legend in an open market transaction.

5    The parties later fell into dispute and on 18 January, and 25 March 2013, the dispute was arbitrated in Singapore. The governing law of agreements was that of England. The Tribunal sitting in Singapore made the following awards and orders:

   (a)    a declaration that the shareholders agreement and the share options agreement are rescinded;

   (b)    …

   (c)    an order that [Legend] pay to the [IFFCO and Kisan] the sum of US$12,350,000 together with interest from 7 August 2008 calculated at the rate of 5.33 per cent per annum until the date of the award;

(d)    …

6    On 22 June 2015, the High Court of Singapore granted IFFCO and Kisan leave to enforce the award in the same manner as a judgment of that Court. Judgment was entered and the award was enforced in Singapore as against Gutnick on 9 July 2015, and as against Legend, on 2 September 2015.

7    On 8 October 2015, IFFCO and Kisan applied to this Court for orders to enforce the Singapore award. The application was heard on 19 November 2015. On the same day, Queensland Phosphate Pty Limited ('QPL') was incorporated in Australia. The directors were Mordechai Gutnick (Gutnick's son), Pnina Feldman (Gutnick's sister), and Sholom Feldman (Pnina Feldman's son).

8    Until 2012, Legend's main business was the development of mining, beneficiation and processing of phosphate assets near Mt Isa in Northern Queensland. In 2012, those assets were transferred to Paradise Phosphate Pty Ltd ('Paradise') in return for 100,000,000 shares being issued to Legend.

9    On 24 November 2015, Legend and Paradise entered into a Convertible Bond and Subscription Agreement and a General Security Deed with QPL. Paradise is a wholly owned subsidiary of Legend.

10    The Bond Deed provided for QPL to subscribe for up to 2,500 convertible bonds with a face value of $1,000 immediately or over time.

11    On 26 November 2015, Legend filed forms with the United States Securities and Exchange Commission ('SEC') notifying the entry into of the transactions with QPL.

12    On 21 December 2015, Croft J delivered judgment enforcing the arbitral award against Legend. On 22 December 2015, Croft J granted an interim stay of execution until 5 February 2016.

13    On 5 February 2016, there was a hearing before the Court of Appeal with respect to Croft J's decision. On 9 February 2016, the Court of Appeal delivered judgment

dismissing the appeal and granted an interim stay of execution until 12 February 2016.

14     On 18 February 2016, after the expiration of the stay, IFFCO and Kisan served a statutory demand on Legend.

15     On 8 March 2016, Legend applied to the High Court of Australia for special leave to appeal.  That application has not been heard as yet.

16     On 10 March 2016, the time for compliance with the statutory demand expired.

17     On 11 March 2016, QPL appointed a receiver to Legend and Paradise.

18     On 11 April 2016, IFFCO and Kisan filed a winding up application of Legend.  The first return date was listed for 11 May 2016.

19     On 20 and 21 April 2016, each of Pnina Feldman and Sholom Feldman provided resignation as directors from the board of Legend in writing.  However, to date, that notification has not been processed by ASIC.  Further, Lee's first affidavit of 10 May 2016 did not deal with any resignations, nor did his second affidavit of 23 May 2016.  From 21 April 2016, if those resignations are effective, the remaining directors of Legend are Gutnick, Mordechai Gutnick, and Henry Herzog.  Henry Herzog is said to now he resides in California, USA.

20     On 22 April 2016, the receiver to Legend and Paradise, transferred the Paradise shares to QPL.  By that date, $400,000 may have been advanced to Legend/Paradise on behalf of QPL.

21     On 8 May 2016, Legend filed its US *Bankruptcy Code* Chapter 11 proceeding.

22     On 10 May 2016, being the day before the return date of the wind up application, Peter Lee, as authorised representative of Legend, filed an originating process seeking recognition of the US proceeding.  That originating process has been subsequently amended, as to date, no order has been made which would disturb Legend itself being in possession of the Legend assets pursuant to the provisions of Chapter 11.

23    On 17 May 2016, there was a status conference hearing before the Honourable Brandan
      L. Shannon, United States Bankruptcy Judge.  That conference has been adjourned to
      ascertain the outcome of this proceeding.

## Issues for determination

24    The issues for determination are as follows:

   (a)    Should I recognise the US Chapter 11 proceedings as a foreign proceeding as
          that phrase is used in Article 15 of the Model Law?

   (b)    If yes, should I recognise the Chapter 11 proceeding as the foreign main
          proceeding and in so doing determine that Legend's centre of its main interests
          (COMI) is in Delaware as per Article 16?

   (c)    Should I recognise the Chapter 11 proceeding as a foreign non-main proceeding
          and in so doing, should I determine that Legend maintains an 'establishment'
          within the meaning of sub-paragraph (f) in Article 2 in Delaware?

   (d)    Should I refrain from recognising the Chapter 11 proceeding as neither a main
          proceeding, nor a non-main proceeding?

   (e)    If I decline to recognise the Chapter 11 proceeding as either a main proceeding
          or non-main proceeding, does s 581 of the *Corporations Act 2001* (Cth) (and/or
          private international law principles, to the extent, if any, that such are not
          picked up or subsumed by s 581) impose a duty upon me not to order a
          winding up of Legend and instead a duty to make ancillary orders in aid of the
          Chapter 11 proceedings?

## Relevant law

25    The issues for determination in this application or these applications, involve
      consideration of the *Cross-Border Insolvency Act 2008* (Cth) ('Act'), the Model Law on
      cross-border insolvency set out at Schedule 1 of that Act.  The UNCITRAL Model Law
      on Cross-Border Insolvency with Guide to Enactment and Interpretation is also

a useful reference but I will not set out any of its provisions in this part of the consideration. I will, if necessary, refer specifically to the UNCITRAL guide at the appropriate juncture.

26    I was not taken to the General Corporation Law of the State of Delaware, nor to the provisions of Chapter 11 of the US *Bankruptcy Code*.

27    Relevant provisions of the *Cross-Border Insolvency Act 2008* (Cth) to which I was taken are as follows:

> Section 6 – **Model law to have force of law in Australia**
>
>> Subject to this Act, the Model Law, with the modification set out in this Part, has the force of law in Australia.
>
> Section 22 – **Interaction with the *Corporations Act 2001***
>
> **Interaction with the Corporations Act 2001**
>
> (1)    If the Model Law (as it has the force of law in Australia) or a provision of this Act is inconsistent with a provision of:
>
>> (a)    Division 9 of Part 5.6 of the *Corporations Act 2001*; or
>>
>> (b)    Part 5.7 of the *Corporations Act 2001*;
>
> the Model Law or the provision of this Act prevails, and the provision of the *Corporations Act 2001* has no effect to the extent of the inconsistency.
>
> (2)    The Model Law (as it has the force of law in Australia) and this Act, are in addition to, and not in derogation of, section 601CL of the *Corporations Act 2001*.

28    Relevant provisions of the Model Law to which I was taken include:

> *Article 2.*        *Definitions*
>
> For the purposes of the present Law:
>
> *(a)*    *"Foreign proceeding"* means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;.
>
> …
>
> *Article 6.*        *Public policy exception*
>
> Nothing in the present Law prevents the court from refusing to take an action

governed by the present Law if the action would be manifestly contrary to the public policy of this State....

...

*Article 15.     Application for recognition of a foreign proceeding*

1.    A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2.    An application for recognition shall be accompanied by:

    (a)    A certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

    (b)    A certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

    (c)    In the absence of evidence referred to in subparagraphs (a) and (b), any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3.    An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

4.    The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.

*Article 16.     Presumptions concerning recognition*

1.    If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph (a) of article 2 and that the foreign representative is a person or body within the meaning of subparagraph (d) of article 2, the court is entitled to so presume.

2.    The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3.    In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

*Article 17.     Decision to recognize a foreign proceeding*

1.    Subject to article 6, a foreign proceeding shall be recognized if:

    (a)    The foreign proceeding is a proceeding within the meaning of subparagraph (a) of article 2;

    (b)    The foreign representative applying for recognition is a person

or body within the meaning of subparagraph (d) of article 2;

 (c)  The application meets the requirements of paragraph 2 of article 15;

 (d)  The application has been submitted to the court referred to in article.

2.  The foreign proceeding shall be recognized:

 (a)  As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

 (b)  As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph (f) of article 2 in the foreign State.

3.  An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4.  The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

…

29  Section 580 of the *Corporations Act* provides as follows:

*Definitions*

In this Division:

*"external administration matter"* means a matter relating to:

 (a)  winding up, under this Chapter, a company or a Part 5.7 body; or

 (b)  winding up, outside Australia, a body corporate or a Part 5.7 body; or

 (c)  the insolvency of a body corporate or of a Part 5.7 body.

*"prescribed country"* means:

 (a)  a country prescribed for the purposes of this definition; or

 (b)  a colony, overseas territory or protectorate of a country so prescribed.

30  Section 581 of the *Corporations Act* provides as follows:

**Courts to act in aid of each other**

 (1)  All courts having jurisdiction in matters arising under this Act, the Judges of those courts and the officers of, or under the control of, those courts must severally act in aid of, and be auxiliary to, each other in all external administration matters.

    (2)      In all external administration matters, the Court:

          (a)      must act in aid of, and be auxiliary to, the courts of:

               (i)      external Territories; and

               (ii)     States that are not in this jurisdiction; and

               (iii)    prescribed countries;

          that have jurisdiction in external administration matters; and

          (b)      may act in aid of, and be auxiliary to, the courts of other countries that have jurisdiction in external administration matters.

    (3)      Where a letter of request from a court of an external Territory, or of a country other than Australia, requesting aid in an external administration matter is filed in the Court, the Court may exercise such powers with respect to the matter as it could exercise if the matter had arisen in its own jurisdiction.

    (4)      The Court may request a court of an external Territory, or of a country other than Australia, that has jurisdiction in external administration matters to act in aid of, and be auxiliary to, it in an external administration matter.

### Recognition of Chapter 11 proceeding

31     Article 16 provides for the recognition of a foreign proceeding if the procedural elements referred to therein have been satisfied subject to the overriding proviso set out in Article 6.

32     Article 6 reserves the Court's discretion to refuse recognition of the Chapter 11 proceeding if it would be **manifestly contrary** (emphasis added) to the public policy of Victoria/Australia. The public policy argument was developed by IFFCO and Kisan in two ways.

33     Firstly, in the written submissions it was set out that:

> ...the effect of recognition of the United States proceeding is that Legend's affairs would remain in the hands of its directors, outside the scrutiny of independent insolvency practitioners who are officers of the Court. This would have a detrimental effect on the creditors of Legend, and undermine the protection given to creditors by Australian insolvency legislation, such as the provisions on public examinations and voidable transactions. The engagement of public policy exception under Article 6 is not triggered by a mere difference between the United States and Australian substantive law. Rather, the recognition of the United States proceedings would impinge the value and

import of the Australian statutory rights of Legend and its liquidator creditors, such that granting comity would severely hinder the Australian Court's ability to carry out the most fundamental policies and purposes of those rights.[1]

34    In *Modern Terminals (Berth 5) Ltd v States Steamship Company*,[2] Trainor J said at 521:

> I am satisfied that Chapter XI proceedings in the United States are intended by the legislature primarily to be for the benefit of all creditors while at the same time affording an insolvent corporation the opportunity to recuperate. The proceedings are only possible with the consent of the creditors who hope that by consenting to them they will receive, at the least, a better dividend. The property and business of the petitioner is operated by him but in the same way as a liquidator in bankruptcy under the laws of Hong Kong might be empowered to carry on the business of the company in liquidation. The Chapter XI debtor is a trustee for the creditors, and his primary function is to operate to their best advantage. In other words, when a debtor is in possession under Chapter XI there is a position analogous to the 'process of universal distribution' referred to by Lord Dunedin at p 513 in *Galbraith v Grimshaw*.[3] I hold that by virtue of the law of the United States and the order of its court the property the defendant has vested in it as if it were a trustee in bankruptcy and that such property wherever situate is under the control of the bankruptcy court in California and that the court in Hong Kong should respect that jurisdiction so far as moveable property here is concerned. *Modern Terminal* was referred to by Allsop CJ in *Akers v Deputy Commissioner of Taxation*,[4] as an example of where a foreign procedure (the Chapter XI proceeding) was for the benefit of all creditors.

35    In *Cambridge Corporation v Unsecured Creditors*,[5] Lord Hoffmann, after referring to the scheme of arrangement system in the UK, said:

> Chapter 11 is considerably more sophisticated and will ordinarily allow the management of the insolvent company to remain in control (as 'debtor in possession') until a plan of reorganisation has been approved by the court. The debtor has a priority right to propose a plan; if this is rejected or the priority period expires, other parties and interests may put forward a different plan.[6]

36    There is no basis for the submission that filing for Chapter 11 protection is contrary to public policy. It is merely a different regime to the Australia equivalent.

37    The second public policy argument is based upon the expressed reason for filing the Chapter 11 proceeding, namely to defeat the Australian proceeding.

---

[1]    Paragraph 65 of the submissions of IFFCO and Kisan.
[2]    [1979] HKLR 512.
[3]    (1910) AC 510.
[4]    [2014] FCAFC 57 at [105].
[5]    [2007] 1 AC 508.
[6]    [2007] 1 AC 508 [4].

38    As to the first ground, IFFCO and Kisan point to the proceeding commenced by Legend as debtor in possession against QPL. In his affidavit of 23 May 2016, Leib Lerner, an attorney and partner of Alston & Bird LLP, a US law firm, set out that:

> Legend opposes and seeks to reverse the appointment of a receiver to [Paradise] by [QPL]. It has demanded that the receiver turn over the Paradise assets, as is required by bankruptcy code section 543(11 U.S.C. & 543). The receiver has not responded, and a complaint will be filed by close of business on May 23 against QPL and the receiver, for avoidance of any transfer of Paradise shares, and for turnover of the Paradise assets and an accounting.[7]

39    The directors of Legend are Joseph Gutnick, Henry Herzog and Mordechai Gutnick. Subject to the acceptance of resignations and processing, Sholomon Feldman and Pnina Feldman may also be directors of Legend. Each of Sholomon Feldman and Pnina Feldman provided letters of resignation, effective immediately, respectively on 20 and 21 April 2016.[8]

40    The current directors of Paradise are Joseph Gutnick, Sholomon Feldman and Pnina Feldman.

41    The current directors of QPL are Pnina Feldman and Sholomon Feldman.

42    IFFCO and Kisan submitted that the familial relationships between the directors of each of the companies should be viewed with scepticism. During the course of argument, it was put that given the familial relationships and the common desire to defeat the claim by Legend and Kisan, the foreshadowed proceeding should be viewed as nothing more than 'appointing a wolf to tend to the sheep'.

43    Although I recognise the obvious potential for a conflict to arise, if not already present, the submission is not convincing for two reasons. Firstly, the submission does not recognise that the appointment of Legend as 'debtor in possession' is not the ultimate order which the Delaware court may make. The starting point in a Chapter 11 process is to maintain Legend in possession of its own assets. Legend's status is altered. Legend is now in the position of a fiduciary, with the rights and powers of a Chapter

---

[7]    Paragraph 18.
[8]    Exhibit A.

11 trustee and is required to perform all but the investigative functions and duties of trustees.  It is open to the Court to appoint a case trustee or an examiner.  It is open to transition the Chapter 11 proceeding into a winding up.

44   In his affidavit of 23 May 2016, Leib Lerner set out as follows:

> 11.   In the Chapter 11 process, the debtor remains in possession and continues to operate its business unless a Chapter 11 trustee is appointed after notice and hearing, and the court makes a finding that such appointment is appropriate for cause or in the interests of creditors.   No part has requested such appointment, and Legend continues to be operated and controlled by its officers and directors.

> 12.   Separate from any private Chapter 11 trustee is the United States Trustee Program and the Office of the United States Trustee.  That is a component of the United States Department of Justice responsible for overseeing the administration of bankruptcy cases and private trustees.

> 13.   The role of the US Trustee Program is to serve as the 'watchdog over the bankruptcy process.'  The mission of the Program is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders ...   Specific responsibilities of the United States Trustee include:

>> (a)   taking legal action to enforce the requirements of the Bankruptcy Code and to prevent fraud and abuse;

>> (b)   referring matters for an investigation and criminal prosecution where appropriate;

>> (c)   ensuring that bankruptcy estates are administered promptly and efficiently, and that professional fees are reasonable;

>> (d)   appointing and convening creditors' committees in Chapter 11 business reorganisation cases;

>> (e)   reviewing disclosure statements and applications for the retention of professionals; and

>> (f)   advocating matters relating to the Bankruptcy Code and rules of procedure in court.

45   The Chapter 11 proceeding is in its infancy and the appropriate supervision of Legend as Plaintiff in the proceeding against QPL may or may not ensue.  That is a matter to be seen if the Chapter 11 proceedings progresses.  Further, the position with the respect to the potential claim against QPL is irrelevant to my consideration of whether or not Article 6 ought to be invoked.  It is a complaint about the efficacy of the potential

proceeding against QPL rather than the efficacy of the Chapter 11 proceeding.

46      On 17 May 2016, a status conference was conducted before the Honourable Brendan
        L. Shannon, United States Bankruptcy Judge.  Legend and Kisan point to the following
        statements made by Mr Lerner on behalf of Legend:

> What kind of sets this all in motion was an equity investment by … [IFFCO];
> it's an Indian cooperative.  They invested around 2008 by buying equity in
> Legend.  It was for the purpose of developing the phosphate interests.
>
> Subsequently, there was litigation between … [IFFCO and Kisan] against
> Legend and against its CEO Joseph Gutnick.  Ultimately, there was an
> arbitration in Singapore and at the arbitration IFFCO and Kisan got an
> arbitration order of $12,350,000 against Legend.  They also got a separate
> judgment against Mr Gutnick and the shares that they had invested in Legend
> were rescinded as part of that order.
>
> Last October, October 2015 they moved to enforce the arbitration award in
> Australia.  That litigation played out in the trial courts.  Ultimately, they were
> successful at the trial court level.  That award in Australia or order that was
> entered essentially confirming the award is on appeal to the High Court, which
> my understanding is that that's similar to our Supreme Court.  That order was
> not stayed.  So IFFCO was able to continue with its enforcement proceedings.
>
> In April it began proceeding to what they call wind up and insolvency.  The
> lack of a better description, essentially they filed an involuntary proceeding.
> The hearing on whether or not that involuntary proceeding should be
> permitted was set for May 11th.  **In order to stop that involuntary proceeding
> and also in order to take care of – what I'm going to get back to in a moment
> concerning Paradise, the debtor filed for bankruptcy on May 8th and
> immediately moved, in Australia, for a recognition proceeding.**  [emphasis
> added]  In other words, called an inverse Chapter 15.
>
> In Australia to recognise the Chapter 11 here in Delaware as the foreign main
> proceeding and to seek all of the protections that are provided by a treaty in
> Australia and to stop any further proceedings against the debtor's assets over
> there.
>
> Before I go further, let me go back to the Paradise issue.  As I said earlier, the
> primary asset of Legend - - - the richest asset at this point is its ownership in
> Paradise, and it's hundred per cent ownership of Paradise and Paradise's
> ownership of these phosphate mines.

47      It was put that Legend clearly accepted that the Chapter 11 filing was to circumvent
        the wind up proceeding commenced first in time in Australia.  It was put that the use
        of such proceeding was contrary to public policy.

48      However, I note that there seemed to be full and frank disclosure of the motive on

behalf of Legend and that IFFCO and Kisan made submissions.  Mr Schepacarter appeared for the United States Trustee.  Mr Schepacarter also seemed to be cognisant of what was transpiring in Australia and submitted that by the time of a further status conference the position in Australia would be ascertained.  In any event, the responses by Shannon J demonstrate that his Honour was cognisant of the issues evolving.  His Honour quite properly sought information about the proceeding before me.

49    In any event, I do not consider, provided all other criteria are met as required by Chapter 11, seeking protection of Chapter 11 is contrary to public policy.  After all, Chapter 11 is designed to achieve protection.  The concept and goals of Chapter 11 are not that far removed from the voluntary administration regime under the *Corporations Act.*

50    In *Loucks v Standard Oil Co of New York*,[9] Cardozo J said:

> A right of action is property.  If a foreign statute gives the right, the mere fact that we do not give a like right is no reason for refusing to help the plaintiff in getting what belongs to him.  We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home … The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness.  They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep rooted tradition of the common weal.

51    Even though Cardozo J's statement was made almost a hundred years ago, I see no reason not to adhere to the underlying sentiment.  Just because the Chapter 11 proceeding may not be consistent with the Australian voluntary administration regime, there is no reason to view the Chapter 11 with any disquiet.

52    In any event, courts are slow to invoke public policy.  In *Jenton Overseas Investment Pty Ltd v Townsing*,[10] Whelan J (as the Justice of Appeal then was) had before him an application to set aside the enforcement of a foreign judgment.  At [20] Whelan J said:

> It seems to me that the authorities reveal that the courts are slow to invoke public policy as a ground for refusing recognition or enforcement of a foreign judgment.  There are few instances in which a foreign judgment has not been

---

[9]    (1918) 224 NY 99 at 110-1.
[10]   [2008] VSC 470.

recognised or enforced on this ground. There are good reasons for this. There
are, as Kirby P puts it, the 'interests of comity' to maintain. The respect and
recognition of other sovereign states' institutions is important. This is
especially so when acting under the *Foreign Judgments Act* where the
registration and enforcement procedures apply on the basis that there is
'substantial reciprocity of treatment' for Australian judgments in the foreign
forum. There is also a need for caution because of the inherent volatility of the
notion of 'public policy'. As Atkinson J points out in *De Santis v Russo*, 'What
is contrary to public policy in one era might not be considered contrary to
public policy in another'. [footnotes omitted]

53    Although Whelan J was considering the registration and enforcement of foreign
judgments, there is no reason why the general concept of 'slowness' should not also
apply to invoking public policy in relation to recognition of a foreign proceeding. The
United States of America is also bound by the Model Law. The Model Law enshrines
reciprocity subject to its provisions. The United States of America is also a 'prescribed
country' for the purposes of s 581(2) of the *Corporations Act*.[11]

54    During the course of argument I left Mr Crutchfield QC know that I would be slow to
invoke the public policy exception and it would be fair to say that Mr Crutchfield did
not press the point thereafter with any alacrity.

55    Legend resisted the submission on behalf of IFFCO and Kisan that the filing of the
Chapter 11 proceeding was contrary to public policy. Mr Moore QC then submitted
that if any party was acting contrary to public policy it was IFFCO and Kisan.
He submitted that IFFCO and Kisan were forum shopping.

56    Mr Lerner produced s 510(b) of the Bankruptcy Code (US). That section provides:

> For the purpose of distribution under this title, the claim arising from rescission
> of a purchase or sale of a security of the debtor or of an affiliate of the debtor,
> for damages arising from the purchase or sale of such a security, or for
> reimbursement or contribution allowed under s 502 on account of such a claim,
> shall be subordinated to all claims or interests that are senior to or equal the
> claim or interest represented by such security, except that if such security is
> common, such claim has the same priority as common stock.

57    It had been put on behalf of IFFCO and Kisan that the Australian position may not be
consistent with s 510(b) of the Bankruptcy Code. The current s 563A of the *Corporations
Act* postpones such a claim until all other debts payable by and claims against the

---

11    Regulation 5.674 of the Corporations Regulations.

company are satisfied. Prima facie there may be a difference in priority between the two statutory provisions.

58   However, the share purchase agreement entered into by IFFCO and Kisan predates the amendment of s 536A. The Second Reading Speech with respect to the *Corporations Amendment (Sons of Gwalia) Bill 2010* sets out that the amendment was introduced to reverse the effect of the High Court's decision in *Sons of Gwalia v Margaretic*:

> The High Court in *Sons of Gwalia* determined that s 563A, as it is currently worded, did not subordinate certain compensation claims by shareholders below the claims of other creditors.

59   Although, I observed during the course of argument that presumably the date of liquidation is the determinative date for which version of s 563A applies, it was put to me by both parties that there was a cogent argument to the contrary. I advised the parties that I had not looked at the authorities and would not do so. That was a determination at curial proceeding and irrelevant to my determination in this judgment.

60   In any event, the facts do not support Mr Moore QC's submission. IFFCO and Kisan applied to Croft J, served the statutory demand, and filed the wind up application all before the Chapter 11 proceeding had any existence.

61   I do not consider the Chapter 11 filing to be manifestly contrary to public policy. IFFCO and Kisan otherwise acknowledge Mr Lee's evidence as to the preconditions for recognition. Accordingly, I will not deal with this issue further. The criteria set out in Article 17(1) are met. The Chapter 11 proceeding is a foreign proceeding as that expression is used in Article 2(a) and Article 17.

**COMI**

62   Article 16 sets out a number of presumptions concerning recognition. Sub-paragraph (3) provides:

> In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

63    The internet printout of what purports to be a certificate of incorporation of Sundew International, Inc (the former name of Legend) sets out that the registered office is located at 110 West Ninth Street, #134, in the State of Wilmington, County of Newcastle, Delaware.  The registered agent is William Y Tay whose address is the same as above.  That certificate appears to have been produced or filed on 1 May 2001.[12]

64    A State of Delaware certificate for renewal and revival of charter appears to have been filed on 14 November 2012.[13]  That certificate sets out that the registered office of the corporation is in the State of Delaware is located at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle.  The name of the registered agent at such address upon whom process against [Legend] may be served is Corporation Service Company.

65    An ASIC Current & Historical and Organisational extract obtained as at 30 May 2016 with respect to Legend's registration as a foreign company in Australia sets out the registered office in Australia and the registered address in place of incorporation.  That address is Havard Business Services Inc, 16192 Coastal Highway, Lewes, Delaware, 19958 United States.  Legend's record keeping leaves a lot to be desired.

66    Neither the *Cross-Border Insolvency Act* nor the Model Law defines 'registered office'. The UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation at [84] refers to the Vigros-Schmit report.  At [73] of the Vigros-Schmit report, the following is set out:

> …

> In principle, the centre of main interests will be in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.

> Where companies and legal persons are concerned, the convention presumes, unless proved to the contrary, that the debtor's centre of main interest is the place of his registered office.  This place normally corresponds to the debtor's head office.

---

[12]    Exhibit 'B'.
[13]    Exhibit 'C'.

67      Mr Moore QC submitted that 'when the [Model] law uses the term "registered office" it means the office nominated in the place of the company's registration'. Further discussing the Australian office, I put it to Mr Moore QC that: 'Even if they had a registered office in the United States, and let's accept it does, why wouldn't that be overtaken with its own document saying, "This is where we are based"?' Mr Moore QC responded: 'Well, Your Honour, it does provide for some creditors, in particular, local creditors here with an address in which it can contact the company or serve documents on the company. That is certainly its function. But it does not displace the fact that the company's registered office is not the Australian office'. After conceding that it was a factor that pointed towards Australia as the centre of main interest, I put a proposition to Mr Moore QC to which he responded that if I so determined, I would be in error. That proposition was: 'But isn't it also a factor [referring to specifying the Australian office as the principal office] which I might conclude that the registered office is in Melbourne, notwithstanding something called a registered office is in the United States.' During the course of further discussion, I noted that the requirement to have a registered office in Australia did not displace the registered office in place of incorporation.

68      Mr Crutchfield QC submitted that the material is replete with references to Legend having its principal office here in Melbourne. Mr Crutchfield QC submitted that the Model Law does not specify the registered office as being the registered office in the company's place of incorporation. The omission removes problems with the old private international law principles that the place of incorporation governed where insolvency administration proceedings ought to have been conducted.

69      Mr Crutchfield QC put it that in 2001 it seemed to be a requirement of incorporation in the State of Delaware that a registered office be specified. The Certificate for Renewal and Revival of Charter filed 14 November 2012, also specifies a registered office in Delaware. However, thereafter, Legend's own filings do not specify an address other than the Melbourne address.

70      Mr Moore QC referred me to documents where New York office of Legend is referred

to. Two matters are of note. First, the New York office is recorded after the Melbourne office, which is described as 'principal office'. Second, the presentations in MSC-34 date from 2008 to the end of 2011. When Legend still controlled the phosphate interests directly, the presentations were part of its capital raising activity, which had ceased by 2012. If anything, the references are contrary to Mr Moore QC's submissions.

71    Mr Crutchfield QC submitted that based upon Legend's own filings, I should determine that its registered office is in Australia. The form 8-K filed with the United States Securities and Exchange Commission dated 24 November 2015, reporting Legend's entry into a convertible bond and subscription agreement and security bond deed, both dated 24 November 2015 with Queensland Phosphate Pty Ltd, on its front page specifies the address of the Principal Executive Office as Level 8, 580 St Kilda Road, Melbourne, Victoria, Australia 3004. A Melbourne telephone number is also specified as the Registrant's telephone number. The deed which is annexed to the report specifies Legend's address as 'of Level 8, 580 St Kilda Road Melbourne Vic 3004'. Clause 20.3 on p 31 of the convertible bond and subscription deed specifies the address of Legend (and Paradise) as follows:

> Attention:    Corporation Secretary or
>
> By hand address: Level 8, 580 St Kilda Road Melbourne  VIC 3004
>
> By mail address: PO Box 6315, St Kilda Road Central Melbourne VIC 3004
>
> Fax: 61 3 8532 2805
>
> Email: legendinfo@axisc.com.au

72    The copy of the historical company search in the State of Delaware dated 12 May 2016 does not specify a registered office in the State of Delaware. It does, however, specify 'registered agent information' which is Corporation Service Company, 2711 Centerville Road, City of Wilmington, Delaware. The printout from the website of Corporation Service Company includes that 'We serve as a registered agent of thousands of corporate entities.' On that basis, it is fair to describe Corporation Service Company as a 'post box'.

73      In *Re Eurofood IFSC Ltd*,[14] Advocate General Jacobs noted:

> Balz, at p 504, puts it in somewhat different terms: "In the case of a mere
> mailbox registration, the headquarters will be treated as the centre of main
> interests."

74      A Form 10-Q, being a quarterly report pursuant to s 13 or 15(d) of the *Securities
Exchange Act 1934* for the period ended June 30 2014, again specifies the St Kilda Road
address as the address of principal executive offices.    The Melbourne telephone
number is also specified.

75      Of note, is the notice of bankruptcy case filing on 8 May 2016 given by the Clerk of the
U.S. Bankruptcy Court.    That notice specifies the address of Legend as 'PO Box 6315,
St Kilda Road Central, Melbourne, Vic 3004, Australia'.

76      Accordingly, there is substantial material emanating from Legend itself to conclude
that the registered office is no longer in the State of Delaware.

77      It does not necessarily follow that the establishment of a registered office in Australia
negates the concept of maintaining a registered office in Delaware.    Further, although
Corporation Service Company may act merely as a post office box, again, that does
not necessarily lead to the conclusion that Legend no longer maintains a registered
office in Delaware.    Rares J was not concerned that the Cayman Island's registered
office was merely a post box.

78      Division 2 of Part 5B.2 deals with the registration of foreign companies.    Legend is a
body corporate, which is subject to this regime. Amongst the documents required in
support of an application for registration is notice of the address of its registered office
under s 601CT.[15]

79      Section 601CT provides as follows:

**601CT  Registered office**

(1)      A registered body must have a registered office in this jurisdiction to
which all communications and notices may be addressed and that must

---

14      [2006] Ch 508, [111].
15      Section 601CE(g).

be open:

...

(4)    A registered body that has lodged a notice under subsection (2) must, within 7 days after a change in the hours during which its registered office is open, lodge a notice, in the prescribed form, of the change.

80    Our *Corporations Act* requires that Legend maintain a 'registered office' in Australia as a condition of registration. 'Registered office' is also neither defined in the *Corporations Act*, nor is it conferred with a status under s 601CT which is any different or lesser to a 'registered office' as that expression is referred to in relation to local companies registered under the *Corporations Act*.

81    Accordingly, I conclude that it is possible to have more than one registered office. The registered office in Australia does not displace the registered office in Delaware. The Model Law does not define registered office as the office in the state of initial incorporation. It cannot be said that the Australian registered office is in some way subjugated or secondary to the Delaware registered office when that expression is applied to the Model Law. Accordingly, I determine that there are two registered offices. The presumption set out in Article 16(3) does not apply to presume the COMI to be in the United States or in Australia.

82    If I am wrong in my conclusion that there are two registered offices and 'registered office' must be given its meaning that it is the registered office in the state of incorporation of Legend, being Delaware, I conclude that the presumption set out in Article 16(3) is rebutted by 'proof to the contrary'. I determine that Legend's COMI is Australia for the reasons set out in the following paragraphs.

## COMI

83    I hereafter set out various case extracts to which I had regard when considering the test for determining COMI.

84    In *Ackers v Saad Investments Company Limited (in official liquidation) (company registered*

*in the Cayman Islands)*,[16] Rares J said [at 30]:

> The expression, 'the centre of the debtor's main interest', is not defined either in the *Model Law* or in the Act. That position was a deliberate legislative choice, as explained in the Explanatory Memorandum for the Cross-Border Insolvency Bill 2008, circulated in the Senate by the Minister for Superannuation and Corporate Law. The Explanatory Memorandum pointed out, in Ch 1.7, that there was a considerable body of common law in overseas jurisdiction in relation to the concept of a centre of main interest. It expected that Australian courts would be guided by that body of law in considering the definition of that expression in the context of the Bill. The Explanatory Memorandum also suggested that such an approach would ensure that the Australian law would be in harmony with that in other jurisdictions.

85    In *Re Bear Stearns High-Grade Structured Credit Strategies Master Fund Limited (in provisional liquidation)*,[17] District Judge Sweet noted that:

> Congress had enacted §1516(c) in slightly different terms to its analogue Article 16(3) of the *Model Law* that required 'proof' to the contrary to defeat the presumed COMI. Instead, Congress had provided that 'evidence' to the contrary was required for that purpose. He said that Ch 15 promoted predictability and reliability by establishing a simple, objective eligibility requirement for recognition. He said that the objective criteria for recognition in Ch 15 reflected the legislative decision by UNCITRAL and Congress that a foreign proceeding should not be entitled to obtain direct access to, or assistance from, the host country courts, unless the debtor had a sufficient, pre-petition economic presence in the country of the foreign proceeding.

He said:

> If the debtor did not have the center of main interest, or at least an establishment, in the country of the foreign proceeding, the local Bankruptcy Court should not grant recognition and was not authorised to use its power to effectuate the purposes of foreign proceedings.[18]

86    Rares J further referred to *Bear Sterns* as follows:

> Both Judges Lifland and Sweet considered that the concept of the center of main interest derived from the European Union Convention on Insolvency Proceedings (done at Brussels, November 23, 1995) that had been in the process of adoption when the *Model Law* was being drafted. The regulation adopting the European Convention explained that the center of main interest meant '… a place where the debtor conducts the administration of his interests on a regular basis and is, therefore, ascertainable by third parties' …

---

16    [2010] FCA 1221.
17    389 BR 325 (SDNY 2008).
18    *Bear Sterns* 389 BR at 333-334; *Ackers*.

87    Subsequently in *Ackers*, Rares J stated at [37]:

37.    Subsequently, in *Re Betcorp Limited* 400 VR 266 (Bankruptcy District of Nevada, 2009) Bankruptcy Judge Bruce A. Markell elaborated on the development of the European Union regulations concept of the center of main interest. He cited the report on the Convention on Insolvency Proceedings by Miguel Virgos and Ethienne Schmit. That report suggested that it was important that international jurisdiction be based on a place known to the debtor's potential creditors. It concluded that this would enable calculation of the legal risks that would have to be assumed in the case of insolvency.

38.    Judge Markell made a comprehensive review of the previous United States decisions, including *Bear Stearns* 389 BR 325. He concluded that their District Judge Sweet had refused recognition because the debtor company existed in the Cayman Islands as merely a shell or letterbox: *Betcorp* 400 BR at 288. He considered that *Eurofood* [2006] Ch 508 and some English decisions confirmed the weight that may be given to a debtor's ascertainable principal place of business, in ascertaining the centre of the debtor's main interests, even when it is not located in the country in which the debtor is registered or incorporated: *Betcorp* 400 BR at 289, 291.

39.    Judge Markell pointed out that giving consideration to a debtor's operational history increased the probability of competing main proceedings, and that probability would defeat the purpose of using the construct of a COMI. He said (*Betcorp* 400 BR at 291):

> "Requiring courts to give weight to the debtor's interests over the course of its operational history may destroy the uniformity and harmonisation that is the goal of employing the COMI inquiry.
>
> Moreover, it is important that the debtor's COMI be ascertainable by third parties. Ran's [*In re Ran* 390 BR 257 at 274-275 (Bankr SD Tex 2008)] analysis correctly proceeds on the assumption that COMI is affected not only by what a debtor does, but by what the debtor is perceived as doing."

40.    Judge Markell reasoned that an inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests were truly centred, merely because of past activities. He said that the result would frustrate two of the purposes of the COMI inquiry, namely first, it would decrease the effectiveness of the insolvency proceeding for which recognition was sought, and, secondly, it might lead to a sub-optimal distribution of the debtor's assets because non-recognition, where recognition is due, might forestall needed international co-operation: *Betcorp* 400 BR at 291.

41.    The experience from the United States cases applying the adapted presumption of a COMI in § 1516(c) has not resulted in readily predictable outcomes. Judge Allan L Gropper, an eminent judge of the United States Bankruptcy Court, Southern District of New York, has written a paper: *Chapter 15 of the United States Bankruptcy Code:*

Lindgren, op cit 149 at 154, that lamented:

> "The goal of the drafters of the *Model Law* and section 1516(c) of the United States Bankruptcy Code of simplifying the process of obtaining an initial order of recognition has not been met, as issues relating to the debtor's centre of main interests have been litigated repeatedly in Chapter 15 cases."

42.   The European Court of Justice in *Eurofood* [2006] Ch 541-542 [29]-[37] considered the formulation of the test for ascertaining the COMI. The presumption in Art 16(3) of the *Model Law* is the same as had been in Art 3(1) of the European Regulation. The Court referred to a recital to the regulation that stated:

> "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

The Court continued (*Eurofood* [2006] Ch at 541-542 [33]-[34]):

> "33   That definition shows that the centre of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties. That objectivity and that possibility of ascertainment by third parties are necessary in order to ensure legal certainty and foreseeability concerning the determination of the court with jurisdiction to open main insolvency proceedings. That legal certainty and that foreseeability are all the more important in that, in accordance with article 4(1) of the Regulation, determination of the court with jurisdiction entails determination of the law which is to apply.
>
> 34   It follows that, in determining the centre of the main interests of a debtor company, **the simple presumption laid down by the Community legislature in favour of the registered office of that company can be rebutted only if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect.**" (emphasis added)

43.   The European Court of Justice's approach was distilled by Lewison J who said that, for the presumption to be displaced, the Court had to be satisfied that the COMI is not in the State in which its registered office is located. His distillation was not contested in the appeal: In *Re Stanford International Bank Limited* [2010] 3 WLR 941 at 958 [30] per Sir Andrew Morritt C. The Chancellor (with whom on these points Arden LJ and Hughes LJ agreed at [107], [152] and [159]), did not try to reconcile the United States decisions with that of the European Court of Justice in *Eurofood* [2006] Ch 508. Morritt C said that, in any event, if there were a difference, the England and Wales Court of Appeal would follow the European Court of Justice: *Stanford* [2010] 3 WLR at 967 [54].

44.   The Chancellor accepted that the derivation of the concept of the COMI in the *Model Law* had come from the definition in the preamble to the

European Regulation quoted above and had been correctly elucidated in the Virgos-Schmidt report: *Stanford* [2010] 3 WLR at 966 [53]. He held that it had been conclusively established that the factors relevant to a rebuttal of the presumption must be both objective and ascertainable by third parties, being matters already in the public domain. Such matters would be what a typical third party would learn as a result of dealing with the debtor company, but would exclude matters that might only be ascertained on enquiry: *Stanford* [2010] 3 WLR 968-969 [56].

88      Rares J, at [49] concluded:

49.     Given the importance to international commerce and, to third parties, of having an objective ascertainable basis upon which to commence and decide proceedings that will govern winding up an insolvency of a debtor under the *Model Law*, in my opinion, the approach adopted in *Eurofood* [2006] Ch 508 and *Stanford Bank* [2010] 3 WLR 941 should be followed here (and see too *Betcorp* 400 BR 260 and Art 8 of the *Model Law* itself). That approach leads to a more predictable and orderly international outcome than the less certain approach adopted by some of the Bankruptcy District Courts in the United States, perhaps because of the different wording of § 1516(c) of Ch 15 of that nation's Bankruptcy Code.

89      And further, Rares J, at [57] concluded:

57.     In the present case, there were many commercial activities in which Saad Investments engaged in various jurisdictions in the world. Some had a closer connection than others with particular places, including, in particular, Switzerland. On the whole of the evidence, however, I am not satisfied that it has been proved that the presumption provided in Art 16(3) has been displaced.

90      In *Kapila, Re Edelsten*,[19] Beach J was considering whether the foreign proceeding was a main or non-main proceeding. Beach J set out guidelines with respect to the determination of COMI.

91      At [53] Beach J said:

In terms of principle, the centre of main interests is where the debtor conducts the administration of the debtor's interests on a regular basis (*Moore* at [20] per Emmett J). In making a determination, the court must have regard to the need for the centre of main interests to be ascertainable by third parties, creditors and potential creditors. It is important, therefore, to have regard not only to what the debtor is doing but also to what the debtor will be perceived to be doing by an objective observer. It is important also to have regard to the need, if the centre of main interests is to be ascertainable via third parties, for an

---

[19]     [2014] FCA 1112.

element of permanency.

92      Beach J set out various criteria which are useful at [54]. Beach J said:

54.     To state these principles is not greatly illuminating. Their generality conceals rather than reveals practical criteria that may inform the question. But no doubt factors to consider (as the UN Guide discusses at [147]) for a natural person would include:

- the location of the debtor's books and records;

- the location where financing was organised;

- the location of the debtor's principal assets or operations;

- the location of the debtor's principal bank or other principal lender;

- the location of the debtor's employees or agents;

- the location of any administration, payroll, accounts payable or cash management activity relating to the debtor's business;

- the location of any taxation authority relevant to the debtor's income from personal exertion and taxation thereon;

- the location of the majority of creditors; one has to evaluate though the relative significance and weighting of variables such as number, value, whether secured or not, and whether present or future, certain or contingent in comparing the relative differences in two or more jurisdictions; only intuitive synthesis or impressionistic assessment rather than quantitative evaluation and precision may be practicable in evaluating the position as between two or more jurisdictions.

93      IFFCO and Kisan submit that Legend's COMI is in Australia and to the extent necessary, if I were to determine that Legend's registered office were in Delaware, the following factors rebut the concept that Legend's COMI was in the United States.

94      Those factors are:

Further or alternatively, it is submitted that the Court should recognise the proceeding as a foreign non-main proceeding, because Legend's centre of main interests is not in the United States. Even if the Court finds that Legend's registered office is in the United States (which is denied), the evidence is sufficient 'proof to the contrary' to discharge any presumption under Art 16(3) of the Model Law:

(a)     All of Legend's directors reside in Australia; the decisions of Legend's directors have been made in Australia;

(b)     Although Legend's filings show an address in Delaware, or in fact two

addresses (Wilmington Address and Lewes Address), there is no evidence that any business is conducted there, and it appeared to be simply a letterbox;

(c)    The principal place of business of Legend was until recently the St Kilda Address, and more recently it is the Southbank Address;

(d)    Legend's primary assets, being its shares in Paradise, are located in Australia; Paradise is an Australian-incorporated company, and the *situs* of the shares is Australia, where the register of shareholders is required to be kept;

(e)    Paradise's key assets are mining tenements in Queensland and the Northern Territory;

(f)    Legend also owns, in its own right, some land and mining tenements in Australia;

(g)    Legend's operations are solely/primarily concerned with activities in Australia, and there is no evidence that it undertakes any activities in the United States. Accordingly, it is open to the Court to find that Legend has not proven one of the preconditions to recognition, namely that it has an 'establishment' (place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services) in the United States, let alone that its centre of main interests is located there;

(h)    Legend's accounting is carried out in Australia. It does not have an ongoing source of revenue. Its revenue stream is normally from interest received on cash in bank and ad hoc tenement disposals and Australian Taxation Office refunds;

(i)    Even putting to one side the judgment debt owed to IFFCO and KIT (who are creditors based in India and United Arab Emirates respectively), a majority of Legend's creditors by both number and value are based in Australia, not the United States;

(j)    There is no evidence, aside from Legend's incorporation in the United States and filing of documents with the Securities and Exchanges Commission necessary to fulfil its legal obligations, of Legend undertaking any activities in the United States.

95    Legend submits that the COMI is in the United States. The factors relied upon by Legend are as follows:

In more detailed terms, Legend's business, and the location in which those activities are centred, involves:

(a)    the raising of investment capital, which includes:

(i)    the capital raising process. 90% of capital raising has taken place in the United States and the majority of its shareholders are based in the United States;

<blockquote>
(ii)    participation in a market for the trading of its issued securities. Legend's shares are traded on the Over-The-Counter trading system in the United States;

(iii)   regulation and oversight of the fundraising process and listing of its securities.   Regulation of the capital raising is in accordance with United States law and subject to the oversight of the United States SEC.
</blockquote>

(b)    investment decisions made by the Legend's directors. The location and activities of Legend's directors is discussed below.

(c)    ownership of shares upon investment, including:

<blockquote>
(i)     Northern Capital resources Corporation – a United States corporation with subsidiaries in the United States and Canada;

(ii)    an investment in the Vortex Fund in Hong Kong; and

(iii)   Gognos Pty Ltd, which holds an investment in South America; and

(iv)    Paradise Phosphate Limited, in Queensland Australia (undoubtedly the most valuable of Legend's investments); and

(v)     other, dormant corporate entities.
</blockquote>

(d)    the monitoring and reporting to investors and compliance with related accounting and regulatory obligations, including:

<blockquote>
(i)     day-to-day management by the board of directors (discussed below);

(ii)    production of accounts and reports. This is undertaken by AXIS Consultants Pty Ltd in Melbourne, in accordance with United States generally accepted accounting principles.

(iii)   the independent audit of those accounts. This is undertaken by Legend's longstanding auditors, PKF, in New York in the United States.
</blockquote>

(e)    Regulatory supervision. Legend is subject to regulation under the supervision of the United States SEC. As a consequence, anyone seeking accounts, disclosure statements and similar filings, that are often sought by potential investors or creditors, may obtain them from the SEC in the United States, objectively demonstrating to such parties Legend's position in the United States and amenability to United States financial regulation. IFFCO itself filed its US Share Purchase documents with the SEC. Similarly, IFFCO's solicitors obtained information about Legend's financial position from the SEC.

(f)    Many of Legend's shareholders and creditors are in the United States.

[citations omitted]

96    Before embarking upon an analysis of the contended for competing factors, I note that the time for assessing the relevant factors is at the time of my determination. In *Moore,*

*as Debtor-in-Possession of Australian Equity Investors v Australian Equity Investors,*[20]

Emmett J said:

19. The centre of main interests is to be determined in the light of the facts as at the relevant time for determination, but those facts may include historical facts that have led to the position as it is at the time for determination. In making a determination, the Court must have regard to the need for the centre of main interests to be ascertainable by third parties, creditors and potential creditors in particular. It is important, therefore, to have regard not only to what the debtor is doing, but also to what the debtor would be perceived to be doing by an objective observer. It is important also to have regard to the need, if the centre of main interests is to be ascertainable by third parties, for an element of permanence.

20. The Court should be slow to accept that an established centre of main interests has been changed by activities that may turn out to be temporary or transitory. There is no principle of immutability (see *Shierson v Vlieland-Boddy* [2005] EWCA CiV 974, [2005] 1 WLR 3966 at [55]). The centre of main interests should correspond to the place where the debtor conducts the administration of the debtor's interests on a regular basis and that is therefore ascertainable by third parties. It must be identified by reference to criteria that are both objective and ascertainable by third parties. That objectivity and that possibility of ascertainment are necessary to ensure legal certainty and foreseeability concerning the determination of which court has jurisdiction to consider insolvency proceedings. In determining the centre of the main interests of a debtor company, the simple presumption laid down by the Model Law can be rebutted only if factors that are both objective and ascertainable by third parties enable it to be established that an actual situation exists that is different from that which locating it at the registered office is deemed to reflect.

97    Turning then to the factors contended for by the parties, I will deal with the same in the order set out in IFFCO and Kisan's submission for no particular reason other than convenience.

**Factor (a) – residence of directors**

98    The directorship of Legend, to put it charitably, is in somewhat of a state of flux. The ASIC records, even those handed up on the second day of the hearing, set out that all five directors reside in Australia. Mr Lee, as secretary and CFO, also resides in Australia. Even if I were to accept that Sholomon Feldman and Pnina Feldman have validly resigned, that leaves Gutnick, Mordechai Gutnick and Henry Herzog as

---

20    [2012] FCA 1002.

residing in Australia. I accept that Mr Herzog is now residing in the United States. However, other than signing off on resolutions of the board of Legend, of which no contemporary resolution has been admitted into evidence, there is no evidence that Mr Herzog conducts any activity on behalf of Legend in the United States. It is significant to note that the material in support of the Chapter 11 filing was signed off by Gutnick (the Australian based director) rather than Mr Herzog. The quarterly report pursuant to s 13 (or 15) (d) of the *Securities Exchange Act 1934* for the period ending 30 June 2014 includes 'During the six months ended June 30, 2014, the corporate management and service fees charged to us [Legend] by Axis was A$237,000 (2013: A$412,000). Axis charged us direct costs of A$478,000 (2013): A$524,000 (for Directors' fees, salaries and salary related matters incurred on behalf of the Company, which relates to our share of salaries paid to the president and chief executive officer, chief financial officer and secretary, executive general manager, general manager business, project manager, and other staff of Axis who provide services to the company, and for independent directors' fees.) Accordingly, even if Mr Herzog resides in the United States, it is apparent that any fee to which he is entitled is paid in Australian dollars in Australia.

**Factor (b)**

99    I am satisfied that the Delaware address, being that of Legend's registered agent in Delaware, is nothing more than a post box. I arrive at that conclusion by the nature of the material published by Corporate Service Company, in particular as it acts as registered agent for thousands of corporate entities. Further, the recent filings in the United States specify the contact address as in Melbourne and where designated, provide a Melbourne telephone number.

**Factor C**

100   It is axiomatic the principal place of business and, I might add the only place of business, is a Melbourne address. That is the address specified in the Chapter 11 filings and returns filed with the United States Securities and Exchange Commission. The Form 10-Q filing for the period ended 30 June 2014 discloses:

(a)    That on 25 March 2014 the company and AXIS entered into a loan agreement and guarantor security deed which was to be repaid on 25 March 2015. During the six months ended 30 June 2014 AXIS charged the company $785,000 for management and administration services and $500,000 for exploration and development services. Albeit that this has a historical context it informs me of what the position of today in that I have had no evidence submitted on behalf of Legend to suggest that the relationship with AXIS and the basis of that relationship has changed in any way. Accordingly, I conclude that Legend's business is conducted in Australia, is managed through the aegis of AXIS. AXIS charges substantial fees for that management which, in part, are allocated for directors fees, salaries and salary related matters incurred on behalf of Legend and salaries paid to the President and Chief Executive Officer, Chief Financial Officer and Secretary, Executive General Manager, General Manager Business, Project Manager and other staff of AXIS who provide services to Legend and for independent directors fees.

(b)    The Chapter 11 filing also sets out that Legend's five bank accounts are all held in Melbourne.

**Factors (d), (e) and (f).**

101    The activities of a holding company must be distinguished from the activities of a subsidiary. The investment in Paradise is nothing more than a passive investment. It happens that Paradise is an Australian company with Australian operations. However, I note that the distinction is not made by Jagot J said in *Young, Jr, in the matter of Buccaneer Energy Limited v Buccaneer Energy Limited:*[21]

7.    The key proposition that emerges from these decisions is that the centre of main interest must be identified by reference to criteria that are objective and ascertainable by third parties. The central difference between the plaintiffs and Chrystal is that the plaintiffs emphasise the operational aspects of the group of companies and Buccaneer as the parent company, those operational aspects being based (according to the plaintiffs) in the United States, whereas Chrystal characterises that evidence as showing that Buccaneer's main centre of interest is in

---

[21]    [2014] FCA 711.

Sydney, Australia, but that it has various subsidiaries incorporated in the United States which conduct oil and gas exploration businesses in the United States.

8.  In support of its characterisation, Chrystal emphasised two documents. The first is an ASIC company extract in respect of Buccaneer which shows Buccaneer's state of registration as Queensland, its current registered office and principal place of business as being an address in Sydney, and that its current and recent former company officers are predominantly (but not exclusively) located in Australia.

9.  The second document is Buccaneer's 2013 annual report (the annual report), which in various places refers to Buccaneer as an "Australian listed company" and identifies Australian directors as well as disclosing the activities of its subsidiaries. Chrystal also pointed to references, in the section of the annual report dealing with Buccaneer's compliance with the ASX Corporate Governance Council's principles of corporate governance, to the board of Buccaneer operating under a charter which reserves to the board various matters that might loosely be characterised as the overall control and direction of the parent company.

10. I am not persuaded that the annual report has the effect for which Chrystal contends. The **annual report** does more than merely identify Buccaneer as an Australian listed company. The very words relied upon by Chrystal do not appear in isolation but, rather, describe Buccaneer as "an Australian listed company focused on developing its 100% owned oil and gas assets in Alaska". Read in its entirety, the annual report discloses that:

    (1)  The main activity of Buccaneer is what is described on the cover page as "Leading the oil & gas revitalisation of the Cook Inlet, Alaska".

    (2)  Buccaneer's wholly owned subsidiary, Buccaneer Resources, is an upstream oil and gas company based in Houston, Texas.

    (3)  Buccaneer's "vision and strategy" as parent company is "Focussed on developing its oil and gas assets in Alaska".

    (4)  "[t]he Group's flagship projects are a series of onshore and offshore developmental and exploration prospects in Alaska's Cook Inlet".

    (5)  Buccaneer has numerous subsidiary companies which are identified as being involved in the exploitation of various oil and gas assets.

    (6)  From early July 2013, following a management restructure, Buccaneer's key management personnel consisted of executives who, together with the directors, comprised "the named relevant consolidated group executives who make or participate in making decisions that affect the whole, or a substantial part, of the business, or who have the capacity to significantly affect the Group's financial standing". While the

domiciles or areas of operations of those named executives are not identified in the annual report, the annual report itself makes reference to some of those executives each being paid in US dollars. There is also other evidence, dealt with below, which indicates that it was objectively ascertainable by creditors, that the activities of those key management personnel took place in the United States.

11. The statements in the annual report about Buccaneer's board charter and compliance with corporate governance principles do not displace the effect of the other material in the annual report which discloses that the parent company's real activities, and not merely those of the subsidiary companies, are focussed on the development of oil and gas assets in Alaska through the activities of a group of key executives who are paid in United States dollars. The overall effect of the annual report is that Buccaneer's operations are in substance solely or primarily concerned with activities in the United States; namely, the exploitation of oil and gas assets in Alaska.

102     The material published or filed by Legend since 2012 demonstrates its major activity is being carried on by its wholly owned subsidiary, Paradise, in Australia. Following Jagot J, if I needed to, such material is convincing when considering COMI.

103     The other passive investments:

Legend currently holds shares in the following companies:

(a)     Legend Diamonds Pty Ltd ACN 140 010 831;

(b)     Teutonic Minerals Pty Ltd ACN 116 513 878;

(c)     Alexya Pty Ltd ACN 146 993 099; and

(d)     AXIS.

(e)     Top End Mineral Limited.

(f)     Merlin Diamonds Ltd.

Each of these companies are registered in Australia.

...

(c)     ownership of shares upon investment, including:

(i)     Northern Capital resources Corporation – a United States corporation with subsidiaries in the United States and Canada;

(ii)    an investment in the Vortex Fund in Hong Kong; and

(iii)   Gognos Pty Ltd, which holds an investment in South America; and

...

      (v)     other, dormant corporate entities.

104    In addition to the passive investments in shares, Legend currently owns property in Mount Isa, Queensland, Australia. It also has land holdings in the Northern Territory, Australia.

105    Legend is the registered holder of 8 mining lease applications in Queensland and 3 exploration licences in the Northern Territory, while Paradise is the registered holder of 8 exploration permits for minerals in Queensland and 2 mining licences in Queensland.

106    However, Legend concedes that the investment in Paradise is 'undoubtedly the most valuable of Legend's investments'.

107    Although I will deal with Legend's contended FOR factors later, I note at this stage that there is simply no evidence to contradict the proposition that each of those passive investments are managed by AXIS on a day to day basis in Melbourne.

108    Legend has entered into a contract with Merlin Diamonds Ltd for royalties from mines in the Northern Territory, Australia. It's motor vehicles are registered in Australia. All of Legend's contracts and unexpired leases are with entities located in Australia.

109    The Chapter 11 filing disclosed that Legend's current assets as at 30 April 2016 sets out total assets of $7,241,096 which I have taken to be represented, in the main, by the Paradise shareholding.

**Factor (g)**

110    There is substantial and compelling evidence that Legend's operations are conducted in Australia. The day to day activities are conducted by AXIS for reward. There is simply no evidence that any of Legend's operations are conducted in the United States. Although it would be fair to say that Legend's activities are passive, whether it be the holding of shares, land or mining leases, there is no evidence of ongoing trading in such shares. I am entitled to assume by the nature of the investments that

Legend's revenue stream is derived from dividends, in the main from Paradise, interests, and perhaps soon to include a revenue stream from mining royalties in connection with its proposed arrangements with Merlin Diamonds Ltd.

**Factor (h)**

111    Legend's accounting is attended to in Australia.   The accounts and reports are compiled using the AUD$.   For the purpose of the Chapter 11 filing the official Form 204 sets out 'accounts kept by debtor in AUD have been converted to USD'.

112    The Form 10-Q quarterly report for the period ended 30 June 2014 is in conformity with US GAAP. I am not appraised of whether there is any great variation with the Australian standards.   Certainly, the reporting currency in the report is Australian dollars.   Those accounts have been unaudited.   Otherwise I accept that auditing as required is undertaken by PKF in New York in the United States.

**Factor (i)**

113    The creditors are as follows:

In Australia

| No | Creditor | Location | Amount ($) |
|---|---|---|---|
| 1. | ASIC | Australia | 3 096.67 |
| 2. | Body Corporate Services Pty Ltd | Broadbeach, QLD | 1 527.72 |
| 3. | David S Tyrwhitt | South Yarra, VIC | 101 501.93 |
| 4. | Northern Territory Department of Transport | Darwin, NT | 771.84 |
| 5. | Herbert Smith Freehills | Melbourne, VIC | 283 044.45 |
| 6. | JI and SM Burnick | South Melbourne, VIC | 1 520.98 |
| 7. | Judicial Holdings Pty Ltd | Gnangara, WA | 121 242.66 |
| 8. | KPMG Financial Advisory | Melbourne, VIC | 18 745.00 |
| 9. | Merlin Diamonds Ltd | South Melbourne, VIC | 539.14 |

| 10. | Mount Isa City Council | Mount Isa, QLD | 3 092.68 |
| 11. | Northern Land Council | Darwin, NT | 65 354.02 |
| 12. | Peter Lee | South Melbourne, VIC | 7 007.56 |
| 13. | POTA Holdings Pty Ltd | Matraville, NSW | 86 601.90 |
| 14. | Queensland Department of Transfer | Brisbane, QLD | 682.24 |
| 15. | Telstra | Melbourne, VIC | 49.94 |
| | | TOTAL | 694 779.73 |

In the United States

| No. | Creditor | Location | Amount ($) |
|---|---|---|---|
| 1. | Continental Stock Transfer & Trust Co | New York, NY | 10 539.87 |
| 2. | Phillips Nizer LLP | New York, NY | 3 898.12 |
| 3. | Quote Media Dynamic Market Data Solutions | Fountain Hills, AZ | 2 081.04 |
| 4. | Richard Layton & Finger | Wilmington, DE | 59 343.69 |
| | | TOTAL | 75 862.72 |

114    IFFCO is an Indian based creditor.  Kisan is a United Arab Emirates based creditor. Notwithstanding those locations, each is entitled to enforce the debts in Australia by virtue of the Croft J decision.  It is logical to seek to pursue the judgment in Australia as that is where the realisable assets are located.

**Factor (j)**

115    I agree there is not any evidence as to any activity in the United States other than set out in Factor (j).

116    Turning then to the activities posited by Mr Moore as demonstrating that Legend's COMI is in the United States.

*Factor (a)*

117    I accept that 90 per cent of the capital raising for Legend took place in the United States and that the majority of its shareholders are based in the United States. However, the shareholder list, although it confirms by virtue of the Cede & Co (FAST) that to be the case in value, the majority of specified individual shareholders would appear to reside in Australia. Mr Moore QC quite properly conceded that that activity ceased in 2012. Accordingly, it is sufficiently removed not to be a factor which ought to be taken into account. In any event, I refer back to the statement that 'the Court must have regard for the need for the centre of main interest to be ascertainable by third parties, creditors and potential creditors.'[22] The position of Legend's shareholders must be considered to be irrelevant.

*Factor (b)*

118    There is simply no evidence that any current decisions are made by Legend's directors in any jurisdiction other than Australia. The only evidence as to day to day management is that being carried out by Axis. It would appear that the only recent directorial decision is that of the Australian based director to sign off on the Chapter 11 filing. The form lodged with respect to the reports filed with the United States Securities and Exchange Commission dated 11 March 2016, 8 May 2016 and 24 November 2015 were signed off by Peter Lee as secretary of Legend. Lee is Australian based.

*Factor (c)*

119    I have already dealt with this issue. The valuable asset is Legend's investment in Paradise. The rest pale in significance in comparison.

*Factor (d)*

120    I have dealt with this issue.

---

22      *Edelsten* at [53].

*Factor (e)*

121    I accept that Legend has a statutory obligation to file in Delaware.  However, any potential investors or creditors searching at the SEC in the United States would readily ascertain that all the activities, including the principal office of Legend, are located in Australia.

*Factor (f)*

122    I have dealt with these issues.

123    I conclude that the overwhelming 'proof' identifies Legend's COMI as in Australia. Apart from the Delaware regulatory requirements, and apart from Legend being originally incorporated in Delaware, the preponderance of Legend's activities are conducted in Australia.  Australia is Legend's COMI.  To the extent needed to rebut the presumption in Article 16(3), IFFCO and Kisan have done so.  Accordingly, I determine that the Chapter 11 proceeding is not a foreign main proceeding.

**Non-main proceeding**

124    Pursuant to Article 17(2)(b), the Chapter 11 proceeding shall be recognised as a foreign non-main proceeding if Legend has an establishment within the meaning of sub-paragraph (f) of Article 2 in the United States.

125    'Establishment' is defined by Article 2(f) to mean 'any place of operations where [Legend] carries out a non-transitory economic activity with human means and goods or services.'  It is accepted that 'goods', as referred to in that sub-article, is intended to take to mean or incorporate 'assets'.

126    In *Gainsford, In the matter of Tannenbaum v Tannenbaum,*[23] Logan J considered the *Cross-Border Insolvency Act* and Model Law in relation to an individual.  However, the principles set out are the same in relation to a corporation such as Legend.  Dealing with the question of 'establishment', at [49] Logan J said:

> On this subject also, I have the benefit of a survey of overseas authority, the same authorities as were relied upon by the applicants, by Heath J in Williams

---

v Simpson at [51]-[61]. Because I agree with that survey, I propose to set out the passage concerned in full:

[51]   In Shierson v Vlieland-Boddy the English Court of Appeal considered whether the debtor had his centre of main interests or an establishment in the United Kingdom.

[52]   The EC Regulation defines the term "establishment" in the same terms as it is defined in New Zealand. The EC Regulation is interpreted in light of a report prepared for the purpose of the earlier European Convention, known as the Virgos-Schmit Report. This report was available to those who prepared the Model Law and is a document that I consider I am entitled to take into account in determining the meaning of the term "establishment", for the purposes of the Act.

[53]   The Virgos-Schmit report describes a "place of operations" as one from which "economic activities are exercised on the market (that is, externally), whether the said activities are commercial, industrial or professional". The authors added that the emphasis on economic activity using human resources demonstrated a need "for a minimum level of organization". A "certain stability" is required.

[54]   In Shierson v Vlieland-Boddy, Chadwick LJ was prepared to uphold the first instance Judge's conclusion that the letting and managing of a single unit in England as "a multi-let business premises" was sufficient to bring Mr Vlieland-Boddy within the definition of "establishment". Longmore LJ agreed with Chadwick LJ's conclusion, as did Sir Martin Nourse. All three Judges took the view that while the premises appeared to be in the name of another entity, they were satisfied, on the evidence, it was possible to infer that other entity was acting as "a front or nominee" for the debtor.

[55]   In Re Ran, the question was whether an Israeli bankruptcy should be recognised as either the main or non-main proceeding, under ch 15 of the US Bankruptcy Code. In doing so, the Fifth Circuit of the US Court of Appeals considered whether Mr Ran had an "establishment" in the United States under the equivalent definition of that term in ch 15 of the US Bankruptcy Code.

[56]   In considering the meaning of the term "establishment" the Fifth Circuit said:

   [12]   Our conclusion is ... supported by a plain language reading of Ch 15, which notes that a foreign nonmain proceeding can exist where a debtor "has an establishment". 11 USC s 1502(2) (emphasis added). Likewise, s 1502(2) refers to an establishment as "any place of operations where the debtor carries out a nontransitory activity". Id. s 1502(2) (emphasis added). The use of the present tense implies that the court's establishment analysis should focus on whether the debtor has an establishment in the foreign country where the bankruptcy is pending at the time the foreign representative files the petition for recognition under Ch 15. See Mark Lightner, Determining the Center of Main Interest Under Ch 15, 17 J. Bankr L & Prac 5, Art 2 (2209).

So in order for Ran to have an establishment in Israel, Ran must have (1) had a place of operations in Israel and (2) been carrying on nontransitory economic activity in Israel at the time that [the Israeli bankruptcy receiver] brought the petition for recognition in the United States. Neither Ch 15 nor its legislative history explain what it means for a debtor to have "any place of operations" or to have "been carrying on nontransitory economic activity" in a location. See H R Rep No 109–31(I), at 107, reprinted in 2005 USCCAN at 170 (mentioning only that the definition was taken from Model Law for Cross-Border Insolvency Article 2). However, the Model Law for Cross-Border Insolvency and the sources from which it emanates provide guidance concerning what it means for a debtor to have an establishment in a location.

[57]    In Ran, the possibility of some lesser test being required in respect of a human debtor, as opposed to a corporate one was considered. After referring to the UNCITRAL Guide to Enactment of the Model Law (the Guide) and the thrust of the Virgos-Schmit Report, the Court said:

[12]    … The mere presence of assets in a given location does not, by itself, constitute a place of operation … In the context of corporate debtors, there must be a place of business for there to be an establishment. Re Bear Stearns, 374 BR at 131; re also Daniel M Glosband, SPhinX Ch 15 Opinion Misses the Mark, 25 Am, Bankr Inst J 44, 45 (Dec/Jan 2007). Equating a corporation's principal place of business to an individual debtor's primary or habitual residence, a place of business could conceivably align with the debtor having a secondary residence or possibly a place of employment in the country where the receiver claims that he has an establishment. See 11 USC s 1516(c) (equating a corporate debtor's registered office with the habitual residence in the case of an individual). At the time [the Israeli bankruptcy receiver] filed his petition for recognition, Ran possessed neither a secondary residence nor place of employment in Israel.

The provision of the US Bankruptcy Code that equates a corporate debtor's registered office with the habitual residence of a human debtor is replicated in art 16(3) of the New Zealand legislation.

[58]    In this context, two decisions in the Bear Stearns litigation are instructive. At first instance, Judge Lifland, in the Bankruptcy Court of the Southern District of New York, declined to recognise a provisional liquidation in the Cayman Islands as either a main or non-main proceeding. In discussing the meaning of the term "establishment", the Judge equated it with "a local place of business", holding that the purely administrative functions of the hedge fund that took place in the Cayman Islands were insufficient to constitute "an establishment" in that jurisdiction. Interestingly, despite making it clear that "the discretionary and flexibility attributes of case law under [the now repealed] s 304 of the Bankruptcy Code [was] misplaced", the Judge held that the provisional liquidators were not without remedy because there was an ability to seek some relief from US Courts. Judge Lifland

referred specifically to the ability to commence an "involuntary case" under either ch 7 or ch 11 of the US Bankruptcy Code. The Judge referred to s 303(b)(4) of the Bankruptcy Code, in saying that the foreign representative was "not left remediless upon nonrecognition".

[59]  Judge Lifland's views were upheld on appeal by the District Court, in which Judge Sweet found that [auditing] activities and preparation of incorporation papers performed by a third party did not, in plain language terms, constitute "operations" or "economic activity" by" those responsible for managing the Funds. To similar effect, the District Court relied on the fact that the hedge funds "had no assets in the Cayman Islands at the time of filing", to support the conclusion that non-main recognition was inappropriate.

[60]  In referring to those authorities, I make it clear that neither they nor I are attempting to define the scope of possible activities that would suffice to demonstrate the existence of an individual debtor's establishment in a particular location. For example, in Ran, the Court of Appeals made it clear, in its conclusion, that it was not attempting to define the scope of possible activities that would suffice to demonstrate either the existence of an individual debtor's centre of main interests or an establishment in a particular location.

[61]  The difficulties inherent in identifying an "establishment" for an individual debtor were recognised in the Guide. That publication suggested that enacting States might wish to exclude from the scope of application of the Model Law insolvencies that related to natural persons residing in an enacting State, whose debts had been incurred predominantly for personal or household purposes (as opposed to commercial or business purposes) or those that related to non-traders. Those observations reflect the fact that UNCITRAL is primarily concerned with trade and the need, for economic reasons, to provide workable mechanisms to resolve cross-border insolvencies involving trading entities with assets or liabilities in different states.

[Footnote references omitted]

127   In addition to setting out the requirement to conduct operations in the United States to qualify as an 'establishment', I draw particular attention to sub-paragraph [59] where reference is made to Judge Sweet finding that [auditing] activities in preparation of incorporation papers performed by a third party did not, in plain language terms, constitute 'operations' or 'economic activity' by those responsible for managing the Funds. Such observation puts an end to Legend's contention that the auditing of the accounts and complying with regulatory supervision in the United States are factors which ought to be taken into account in determining COMI. They are not sufficient to even support the contention that there is an 'establishment' in the United States. There is no evidence of any other activity which might support the

contention of maintaining an 'establishment' in the United States.

128   Accordingly, I decline to recognise the Chapter 11 proceeding as a non-main foreign proceeding.

### Section 581 of the Corporations Act and International Private Law Principles

129   As s 581 effectively enshrines the international private law principles, I will not deal with such principles separately.

130   Section 581 operates independently of the Model Law.  It may apply where the Model Law does not.  Similarly, given the definition of 'foreign proceeding' in the Model Law differs from the conditions that must be met in order for s 581 to apply, it is possible for the Model Law to apply where s 581 does not.

131   In order for s 581 to apply, there must be an 'external administration matter'. Section 580 provides that:

> *external administration matter'* means a matter relating to:
>
> (a)   winding up, under this Chapter, a company or a Part 5.7 body; or
>
> (b)   winding up, outside Australia, a body corporate or a Part 5.7 body; or
>
> (c)   the insolvency of a body corporate or of a Part 5.7 body.

132   Does the proceeding in this Court meet that description?  Yes.  Does the proceeding in the US meet that description?  Legend is not being wound up in the US.  If s 581 is to apply, it could only be because the proceeding in the US is a matter relating to the insolvency of Legend.

133   In *ML Ubase Holdings Co Ltd v Trigem Computer Inc*, Brereton J said:

> Section 580 defines "external administration matter" as a matter relating to, relevantly, the winding up, outside Australia, of a body corporate, or the insolvency of a body corporate. The corporate reorganisation proceedings are not winding up proceedings, but are akin to a scheme of arrangement (*QBE Workers Compensation (NSW) Ltd v Wandiyali ATSI Inc (In Liq)* (2004) 62 NSWLR 117 at [12]; *Re Independent Insurance Co Ltd* (2005) 193 FLR 43 at 48 [8]. However, the order to commence a corporate reorganisation was made on the grounds "that Trigem Inc was in a state in which it could not pay its debts when due without causing significant disruption to its business and where there may occur a cause for its bankruptcy"; in my view that is sufficient to

establish that the corporate re-organisation proceeding is a matter relating to the insolvency of Trigem Inc.[24]

134    The 'matter relating to the insolvency' criterion was also considered in *Re Independent Insurance Company Ltd*, where Barrett J said:

> The opinion of the directors, as stated in the winding up petition, was that Independent Insurance "is insolvent and unable to pay its debts within the meaning of the Insolvency Act 1986". That is an opinion shared by the provisional liquidators. I am satisfied, therefore, as to the existence of "insolvency" of Independent Insurance, with the result that I proceed on the footing that there exists "the insolvency of a body corporate" and, accordingly, that each matter in respect of which this court's aid is sought, being a matter "in relation to" the insolvent administration presided over by the provisional liquidators in England, is an "external administration matter" for the purposes of s 581.[25]

135    In the US, a debtor becomes a 'debtor in possession' in a reorganisation without the court having to make any order commencing the reorganisation.[26] When a voluntary bankruptcy petition is filed, there is no external assessment of the debtor's solvency. Further, the debtor itself may not have provided any assessment of its solvency.

136    The material in support of the Chapter 11 filing sets out total assets as $7, 241,096. The total debts are set out as $13,206,921. Albeit, pursuant to s 510 of the Bankruptcy Code US, the claim by IFFCO and Kisan might be subordinated, each of those entities are still creditors for the amount of US $12,350,000. That debt is noted as 'disputed' in the Form 204. Although the registration of the judgment in Australia is the subject of a Special Leave Application to the High Court, it has not been put to me that the underlying arbitral award has been sought to be appealed or reviewed in any way. Accordingly, prima facie, Legend was insolvent at the time of filing the Chapter 11 voluntary petition. In those circumstances, I determine that the Chapter 11 proceeding is an external administration matter within the meaning of s 580.

137    The obligation imposed on this Court by s 581(2)(a) to 'act in aid of, and be auxiliary to' applies to other courts. That is, this Court is to act in aid of and be auxiliary to *courts*. It is important that no request for assistance has been made by the US court in

---

24    (2007) 69 NSWLR 577, [53].
25    [2005] NSWSC 587, [8].
26    See Chapter 11, s 301(b).

this case.  Rather, it is the 'foreign representative' making the request (as long as Legend, being a 'debtor in possession', can properly be characterised as a 'foreign representative') for those purposes.

138    In *Re Independent Insurance Company Ltd* Barrett J said:

> Section 581(3) applies where a letter of request is received from a court of an external Territory or a court of a country other than Australia. It pays no attention to whether the other country is a "prescribed country". The effect of s 581(3) is to confer a discretion upon the court rather than directing it to act. The discretion is a discretion for the court to "exercise such powers with respect to the matter as it could exercise if the matter had arisen in its own jurisdiction".

> Sections 581(2)(a) and 581(3) are thus quite different in purpose and effect. Section 581(3), which is activated only by receipt of a letter of request, allows the court, in effect, to treat the foreign matter as if it were a matter that had arisen within the court's own jurisdiction and to make any order within its own armoury of orders relevant to such a domestic matter. Section 581(2)(a), on the other hand, imposes a requirement to act. It is not triggered by a letter of request (in the sense that the court may act under it in the absence of a letter of request), although absence of any request from the court of the external Territory or prescribed country is likely to mean that the Australian court does not know what action by it is (or might be thought to be) "in aid of" or "auxiliary to" the other court. A letter of request is thus, in that way, a means of giving content to the s 581(2)(a) requirement, as well as bringing s 581(3) into play.[27]

139    In this proceeding, the Court does not know what action is or might be thought to be in aid of or auxiliary to the US court.  In order to act in aid of and be auxiliary to the US bankruptcy court, this Court would need an indication from that court of the assistance it needs.

140    While the Court is required to act in aid of and be auxiliary to the US bankruptcy court, it is not yet clear what assistance is required by that court. The only progression of the Chapter 11 filing is to convene and hold a case conference. There has been no indication of what is proposed by Legend in the Chapter 11 proceeding.

141    Mr Moore QC submitted that I have a duty under s 581(2) to act in aid of the US Bankruptcy Court in the absence of a request as the United States is a prescribed country.  I accept that submission. Mr Moore QC then submitted that making a

---

[27]    [2005] NSWSC 587, [13]-[14].

winding up order would be the antithesis of providing aid or would be repugnant as it would defeat the purpose of the Chapter 11 proceeding. I have not been able to find a case directly on issue but note that in *Titchfield Management Ltd v Vaccinoma Inc*[28] Barrett J made a winding up order where the Part 5.7B body had already been wound up in Delaware. Barrett J was not taken to s 581.

142    I do not consider that Shannon J or any court in the United States would find that a winding up order is repugnant in the circumstances.   After all, the United States trustee proposed that there be another status conference so that the position in Australia could be ascertained, and I infer that Shannon J adjourned the further status conference to after this hearing.

143    I will make a winding up order.

### Orders

144    Proceeding S CI 2016 01730 is dismissed.  Given the amendment of the plaintiff to Legend itself as debtor in possession of the assets of Legend, it serves no utility to order that it pay the costs of IFFCO and Kisan.  Accordingly, I will order that the costs of IFFCO and Kisan be treated as costs as if they were costs in the winding up of Legend and be paid in the same priority as set out in s 556(1)(b).

145    In proceeding S CI 2016 01290 I make the following order.

    1.    The requirement that the plaintiff publish notice of the application pursuant to r 5.6 of the *Supreme Court (Corporations) Rules 2013* is dispensed with.

    2.    Legend International Holdings Inc (ARBN 120 855 352) be wound up in insolvency under the provisions of the *Corporations Act 2001*.

    3.    Mark Korda and Craig Shepard jointly and severally are appointed liquidators for the purposes of the winding up.

---

[28]    (2008) 68 ACSR 448.

4.      The plaintiffs' costs, including reserved costs, are costs of the winding up.

---

## CERTIFICATE

I certify that this and the 45 preceding pages are a true copy of the reasons for Judgment of Randall AsJ of the Supreme Court of Victoria delivered on 2 June 2016.

DATED this second day of June 2016.

.......................................................................
Associate

